UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JODI D. PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-00160-SEB-MJD |
| | ) | |
| CAROLYN COLVIN Acting Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Jodi Parker requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d), & 1382c(a)(3). For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be **AFFIRMED**.

## Procedural History

Parker filed an application for DIB and SSI in September 2010 alleging an onset of disability on July 5, 2009. Parker's application was denied initially on January 31, 2011, and on reconsideration on April 21, 2011. Parker requested a hearing, which occurred before Administrative Law Judge ("ALJ") Blanca B. de la Torre on June 4, 2012. The ALJ concluded Plaintiff was not disabled at any time from her alleged onset date through the date of the ALJ's August 27, 2012 decision. The Appeals Council denied Parker's request for review on December

1

4, 2013, rendering the ALJ's decision final. Parker filed her Complaint with this Court on February 4, 2014.

## Factual Background and Medical History

Parker was forty-six years old when she applied for benefits due to a hip injury, knee injury, bipolar disorder, and hearing loss. [R. at 90.] She had previously worked as a cashier for companies including Menards and Wal-Mart. [R. at 45-52.] Parker received medical treatment through her primary care physician, Dr. Jose Valena, between 2008 and 2012. [R. at 19.] Dr. Valena diagnosed conditions including hypertension; diabetes mellitus; chronic back pain; osteoarthritis of the spine, knees, and hips [R. at 19, 267, 480]; anxiety disorder, [R. at 480, 588]; and bipolar disorder. [R. at 273, 286.] Parker received medication for her hypertension and diabetes, as well as pain medications to manage her hip, knee, and back pain. [R. at 19.]

In 2009, Parker also received medical care during several emergency room visits. In January, she received treatment for left knee pain, but X-rays were negative. [R. at 372-74.] In April, Parker presented to the ER with back and hip pain, but X-rays were again negative. [R. at 364-67.] Finally, in May, Parker sought treatment for chest and left arm pain, [R. at 345], but tests found "no active disease," [R. at 356], or anomalies. [R at 358.] The ER released her in stable condition. [R. at 360.]

The next year, Parker underwent medical consultations as part of the benefits application process. Dr. Nicole Caldwell performed a physical consultative exam in November 2010, at which Parker stated she suffered from back, hip and knee pain after being involved in a car accident several years earlier. [R. at 420.] Parker also stated she had been diagnosed as bipolar, but reported that her medication managed it well. [*Id.*] Parker alleged a history of hearing loss, but Caldwell observed that Parker could understand speech at a normal volume. [*Id.*] Caldwell

also noted Parker's lungs were clear; her extremities were normal; her neurological function was intact; and her posture and gait were normal. [R. at 421.] Caldwell concluded Parker suffered from chronic hip pain, chronic back pain, and osteoarthritis. She recommended additional imaging tests to assess these conditions. [*Id.*]

These tests produced mixed results: X-rays of Parker's left hip were negative, [R. at 424], but X-rays of her knees showed a loose body and osteoarthritis. [R. at 425-26.] An X-ray of her back showed mild degenerative changes, [R. at 427], and later knee X-rays showed a potential meniscus tear. [R. at 637-40.]

Also in November 2010, Parker underwent a psychological consultative exam. [R. at 412.] Dr. Javan Horwitz performed the examination and found that although Parker was initially uncomfortable, she had good social reciprocity, attempted each task with full effort, and related to the examiner with average ability. [R. at 414-16.] Dr. Horwitz noted Parker's history of bipolar disorder and anxiety, [R. at 413], and stated her "mood instability may slow her [work] performance down at times." [R. at 416.] Dr. Horwitz nonetheless determined Parker could perform simple tasks "without much difficulty." [*Id.*] Parker also described to Dr. Horwitz her physical limitations, such as back and hip pain, and Horwitz suggested these limitations may "significantly compromise[]" Parker's occupational performance. [*Id.*]

In January 2011, Disability Determination Bureau doctors completed physical and mental RFC determinations. [R. at 428, 436.] Dr. A. Dobson completed the physical RFC analysis. [R. at 435.] After reviewing Parker's records and the notes from the 2010 consultative examination, Dr. Dobson concluded Parker could stand and/or walk for about six hours per day; sit for about six hours per day; and otherwise engage in a range of light work. [R. at 428-435.] Dr. Randal Horton completed the mental RFC analysis. [R. at 440.] He acknowledged Parker's history of

bipolar disorder and anxiety, but determined Parker could relate to coworkers "on at least a superficial basis" and could attend to tasks for "sufficient periods of time to complete" them. [R at 438.] His Psychiatric Review Technique also determined that Parker's impairments did not meet or medically equal a listing in 20 CFR Part 404's Listing of Impairments. [R. at 440-52.]

In 2012, Parker was hospitalized on two occasions. In March, she was admitted after complaining of muscle pain and weakness. [R. at 549.] Tests revealed she had low potassium levels, and she was discharged on a potassium supplement. [R. at 557.] During this stay, the hospital also diagnosed chronic obstructive pulmonary disease ("COPD"). [R. at 557.] At the time, Parker's oxygen saturation was low (85%), [R. at 548], and hospital staff heard "crackles" in her lungs. [R. at 581.] Upon discharge, Parker was instructed to use "[o]xygen per nasal cannula with activity," [R. 558], but Parker did not complain of respiratory distress. [R. at 579.]

In April 2012, Parker was hospitalized a second time. She complained of nausea and back pain. [R. at 596.] The hospital determined her potassium levels were now abnormally high, and concluded she was suffering renal failure. [R. at 597.] The hospital again noted the COPD diagnosis, [R. at 598], but Parker did not complain of respiratory symptoms. [R. at 604.] Her lungs were "clear," [R. at 606], and her oxygen saturation level was much higher. [R. at 597.]

At the June 2012 hearing before the ALJ, Parker testified about her condition. She stated she could stand for 45 minutes at most; could walk perhaps a few blocks; and likely could not sit for periods long enough to work behind a desk. [R. at 58-62.] The ALJ found the claimant's testimony not credible. [R. at 24.] She noted Parker had previously reported being able to care for her mother and perform routine chores, such that she likely could perform light work. [R. at 24.] The ALJ also credited Dr. Dobson's and Dr. Horton's reports, both of whom concluded Parker could perform certain unskilled work. [R. at 23-24.]

4

Parker further testified she had begun using supplemental oxygen because of respiratory difficulties when exerting herself. [R. at 68-69.] The ALJ noted there was little evidence of oxygen use or respiratory ailments in the record, [R. at 38-39], and Parker's attorney agreed that he was "curious about the oxygen thing." [R. at 38.] The ALJ held the record open to receive additional evidence of Parker's respiratory condition, but she did not submit any new evidence. [R. at 11.]

At the hearing, the ALJ received the testimony of vocational expert Robert Barber. The ALJ asked whether a hypothetical person of Parker's age, education, and work experience could perform Parker's past work as a cashier, provided the person could sit for one hour at a time for a total of six hours; stand for one hour at a time for a total of four hours; or walk for four hours at a time for a total of eight hours. The ALJ also limited the hypothetical person to "quiet" and "moderate" noise levels. The ALJ, however, did not include any respiratory limitations; any social limitations; or any limitations describing renal failure. [R at 76-77.]

The vocational expert responded that such a person would be able to perform the work that Parker had previously performed as a cashier at Wal-Mart. [R. at 77.] The expert also testified such a person could perform work as an apparel sorter, usher, and information clerk, and stated several thousand of these positions existed in Indiana and the national economy. [R. at 77-78.] Finally, the ALJ asked whether the hypothetical person could perform any sedentary work. The expert stated such a person could perform sedentary work as a general office clerk, ticket checker, and telephone quote clerk. [R. at 78.] Again, the expert stated several thousand of these jobs existed in the state and the nation. [R. at 28, 78.]

**Applicable Standard**

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423.[1] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

---

[1] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## **The ALJ's Decision**

The ALJ first determined Parker met the insured status requirements of the Act through September 30, 2013. Applying the five-step analysis, the ALJ found at step one that Parker had not engaged in substantial gainful activity since July 5, 2009, the alleged onset date. At step two, the ALJ found Parker had the following severe impairments: osteoarthritis of the right knee; degenerative disc disease of the lumbar spine; hypertension; diabetes mellitus; mild to moderate bilateral hearing loss; bipolar disorder; and anxiety. At step three, the ALJ determined Parker did not have an impairment or combination of impairments that meets or medically equals any impairment in the Listing of Impairments.

After step three but before step four, the ALJ found Parker had the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The ALJ determined Parker could:

> [L]ift and carry twenty pounds occasionally and ten pounds frequently; sit for one hour at a time, for a total of six hours in an eight-hour workday; stand for one hour at a time, for a total of four hours in an eight-hour workday; and walk for one hour at a time, for a total of four hours in an eight-hour workday. She cannot climb ladders, ropes, or scaffolds; kneel or crawl, but occasionally can climb stairs and ramps, balance, stoop, and crouch. She is able to work in environments with the following noise levels; noise intensity level number two, "quiet" . . . and noise intensity level three, "moderate[.]"

The ALJ also determined Parker could:

> [U]nderstand, remember, and carry out short, simple, and repetitive instructions. She is able to sustain attention and concentration for two-hour periods at a time, for eight hours in a workday, on short, simple, and repetitive instructions. Finally, she can use judgment in making work-related decisions commensurate with the type of work defined.

[R. at 18.]

At step four, the ALJ determined Parker could perform her past relevant work as a cashier and was therefore not disabled. [R. at 26-27.] The ALJ nonetheless proceeded to step five and determined that a person of Parker's age, education, work experience, and residual functional capacity could perform other jobs in the national economy, including apparel sorter, usher, information clerk, general office clerk, ticket checker, and telephone quote clerk. [R. at 27-28.] Because these jobs existed in significant numbers in the national economy, the ALJ again concluded Parker was not disabled.

## Discussion

Plaintiff attacks the ALJ's decision on two fronts: Plaintiff first argues the ALJ did not support her physical RFC determination with substantial evidence. Plaintiff specifically contends the ALJ ignored Parker's COPD and need for oxygen; ignored a diagnosis of renal failure;

8

improperly concluded Parker can stand and walk for eight hours per day; and ignored Parker's hearing difficulties.

Second, Plaintiff argues the ALJ did not support her mental RFC determination with substantial evidence. Specifically, Plaintiff contends the ALJ ignored Parker's social limitations and improperly discounted Dr. Horwitz's opinions on Parker's mental functioning.

Because of these allegedly erroneous RFC determinations, Plaintiff contends the ALJ's step four and step five conclusions—that Parker could perform her past work as a cashier or perform other relevant work—were not supported by substantial evidence. The Court addresses the physical and mental RFC determinations in turn.

**A.     Physical RFC determination**

**1.     Failure to Consider COPD and Need for Supplemental Oxygen**

Plaintiff contends the ALJ improperly ignored Parker's COPD and need for supplemental oxygen with exertion. [Dkt. 17 at 16.] Plaintiff notes the ALJ did not include restrictions in her hypothetical questions to determine if these alleged conditions would limit Parker's ability to work. [*Id.*] Plaintiff also argues the ALJ ignored objective medical evidence of COPD and the need for supplemental oxygen by failing to mention 1) "[c]rackles" in Plaintiff's lungs; 2) Plaintiff's low oxygen saturation levels; and 3) abnormalities in imaging studies of Plaintiff's lungs. [*Id.*]

The Commissioner contends the ALJ was aware of the COPD diagnosis and that the record contains little evidence of COPD or the need for supplemental oxygen. [Dkt. 18 at 10-11.] Defendant further maintains that in formulating Plaintiff's RFC, the ALJ reasonably considered what little evidence of COPD and need for supplemental oxygen was present in the record, and therefore did not err in her RFC analysis. [*Id.* at 10.]

9

An ALJ constructing a claimant's RFC "must evaluate all relevant evidence." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). This means explaining the decision with enough detail to permit meaningful review. The ALJ need not "mention every snippet of evidence in the record," but cannot ignore "entire lines of contrary evidence." *Id.*

The ALJ in this case did not ignore Plaintiff's COPD. At Parker's hearing, counsel specifically directed the ALJ's attention to the COPD diagnosis, and the ALJ asked whether Parker required more time to submit additional evidence of the condition or its effects. [R. at 40.] The ALJ held open the record for fifteen days to receive additional evidence, [R. at 11, 40], but Parker did not submit any new evidence of COPD or the need for supplemental oxygen. [R. at 11.] Contrary to Plaintiff's argument, then, the ALJ did not ignore this line of evidence; rather, the ALJ simply had little evidence to consider at all.

Moreover, a diagnosis in and of itself does not imply a claimant suffers functional limitations. *See Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998); *see also McCann v. Colvin*, No. 2:13-CV-00323-JMS-MJ, 2014 WL 4259632, at *8 (S.D. Ind. Aug. 29, 2014) (noting that "the diagnosis of an impairment does not alone establish its severity and its resulting limitations" (citation omitted)). Thus, Parker's COPD diagnosis does not on its own establish a limitation the ALJ had to include in her RFC analysis. Instead, to establish a disabling limitation, a claimant must supply "factual evidence" of "actual disability." *Estok*, 152 F.3d at 640; *see also Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (rejecting disability claim because no "objective support in the medical records" indicated a diagnosed condition caused disabling symptoms). The ALJ in this case was therefore not obligated to include the COPD diagnosis in her questions to the vocational expert.

Parker nevertheless contends that—despite supplying no new evidence—the record contained enough evidence of COPD and breathing difficulties to establish a limitation in the ALJ's RFC analysis. [Dkt. 17 at 18.] This is not the case.

Plaintiff first points to the March 2012 hospital visit during which the hospital staff heard "[c]rackles" in Parker's lungs. [Dkt. 17 at 17; R. at 581.] That visit's discharge diagnosis, however, did not include any respiratory illness, [R. at 583], and Plaintiff complained of "back pain" [R. at 544, 547], not respiratory distress. Plaintiff then saw her primary care physician in April 2012. That doctor reported Parker's lungs were "clear" and her breathing was "non-labored." [R. at 587.] The doctor's review of Parker's systems was also "negative" for respiratory ailments. [R. at 585.] Thus, the isolated finding of "crackles" does not establish that Parker suffered from limiting respiratory symptoms.

Plaintiff next points to "repeatedly low oxygen saturation levels" as evidence that the ALJ should have included a respiratory limitation in her hypothetical questions. [Dkt. 17 at 17.] Plaintiff cites the same March 2012 hospital visit discussed above. Her oxygen saturation level at that time was 85%, but Plaintiff "denie[d] shortness of breath" and had "no respiratory distress." [R. at 548.] Later oxygen saturation levels were much higher: during the April 2012 hospital visit, her saturation level was between 97% and 99%. [R. at 616.] Hence, much like Plaintiff's "crackles," the low oxygen saturation level was a short-lived condition that did not cause limiting symptoms.

Relatedly, Plaintiff argues the ALJ failed to account for Parker's "need for supplemental oxygen" with exertion. [Dkt. 17 at 18.] This characterization exaggerates Plaintiff's condition. Upon discharge from the hospital in March 2012, Parker's physician prescribed "[o]xygen per nasal cannula with activity," [R. at 558], and Parker underwent a home oxygen evaluation on

March 30, 2012. [R. 564.] By the time of her April 2012 hospital visit, however, Plaintiff's oxygen saturation levels were between 97% and 99% without supplemental oxygen. [R. at 616.] On discharge, Plaintiff was instructed to engage in activity "as tolerated" without any requirement of supplemental oxygen. [R. at 630.]

Plaintiff also notes she informed the ALJ at the June 2012 hearing that she had started using supplemental oxygen. [Dkt. 17 at 18; R. at 38.] The ALJ held the record open to receive evidence of this claim, [R. at 40], but Parker failed to submit any evidence. [R. at 11.] Because it is "axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove" her claim of disability, *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004), the ALJ was justified in giving little weight to Parker's unsubstantiated claim.

Plaintiff finally points to imaging studies showing abnormalities in Plaintiff's lungs as evidence that the ALJ should have imposed a respiratory limitation. [Dkt. 17 at 17.] Plaintiff relies on a March 2012 CT scan that showed "septal thickening" and "pleural effusions" (excess fluid) in Parker's lungs. [R. at 568.] That report, however, described these abnormalities as "mild" and "minimal." [*Id.*] Also, during the hospital stay at which the CT scan was performed, Plaintiff did not complain of respiratory symptoms. [R. at 552, 579.]

The medical evidence therefore does not indicate Parker suffered any respiratory symptoms that would have limited her RFC, and the ALJ did not err in declining to include COPD or impose respiratory limitations in her questions to the vocational expert. *See, e.g., Burton v. Astrue*, No. 4:08-CV-216-SEB-WGH, 2010 WL 987227, at *6 (S.D. Ind. Mar. 12, 2010) (finding ALJ is not obligated to include a condition that does not cause functional impairments).

**2.     Failure to Consider Renal Failure**

Plaintiff next argues the ALJ improperly ignored a diagnosis of chronic renal failure [Dkt. 17 at 17; R. at 597], by omitting the condition in her hypothetical questions. [R. at 76-77.] Plaintiff calls this a "serious omission" and asserts the vocational expert's responses to these "incomplete" questions cannot justify a denial of benefits. [Dkt. 17 at 18.]

An ALJ's hypotheticals "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron*, 19 F.3d at 337. They must "orient the [vocational expert] to the totality of the claimant's limitations." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

The ALJ in this case did not explicitly mention Parker's renal failure, but the ALJ nevertheless discussed the symptoms associated with the condition: The renal failure diagnosis arose as a result of plaintiff's hospitalizations for abnormal potassium levels in March and April 2012. [R. at 597.] The ALJ discussed these hospitalizations and noted that Plaintiff presented with "muscle pain," "weakness" and "nausea." [R. at 21-22.] The ALJ also discussed the course of treatment, and observed Parker "responded to therapy well," "regained full motor function," and was discharged in stable condition. [*Id.*] The medical record therefore indicates Plaintiff's renal failure did not have a lasting impact on her physical capacity. Thus, even if the ALJ's hypotheticals did not include "renal failure," they still oriented the vocational expert to the actual limitations Plaintiff suffered. *See Magray v. Shalala*, 880 F. Supp. 1278, 1288 (E.D. Wis. 1995) (approving hypothetical questions that omitted name of condition but included resulting functional limitations).

Plaintiff essentially argues the RFC and hypotheticals must be faulty because the ALJ did not use the explicit words "renal failure," but the Seventh Circuit has cautioned against elevating

form over substance. *Cf. O'Connor-Spinner*, 627 F.3d at 619 (rejecting "per se requirement" of "specific terminology" in mental RFC determinations). As such, the ALJ did not ignore Plaintiff's renal failure in a way that undercuts her RFC analysis or use of hypothetical questions.

**3.      Improper Standing and Walking Assessment**

Plaintiff next argues the ALJ erroneously evaluated her standing and walking capacity. [Dkt. 17 at 19]. As part of the benefits application process, Dr. Dobson performed a physical RFC analysis and determined Parker could "stand and/or walk" for a total of six hours per day, or sit for a total of six hours per day. [R. at 429.] Plaintiff contends the ALJ nonetheless determined Parker could stand and walk for a total of eight hours each day, and that the ALJ failed to explain why she was using an RFC that was less restrictive than Dr. Dobson's opinion. [Dkt. 17 at 19.]

This is not the case: At the hearing, the ALJ asked the vocational expert about the type of work someone of Plaintiff's age, education, and work experience could perform if he or she could "stand for one hour at a time for a total of four in the eight hour work day" or "walk for one hour at a time for a total of four in the eight hour work day." [R. at 76 (emphasis added).] The ALJ thus limited the amount of time spent standing or walking to a greater degree than did Dr. Dobson. Also, although Plaintiff contends the ALJ implied the hypothetical worker could stand or walk in combination for the entire eight-hour day, the ALJ clarified at the hearing that the person could be "standing for four hours of eight and the rest sitting." [R. at 79 (emphasis added).] Contrary to plaintiff's argument, the ALJ's hypothetical thus envisioned a combination of sitting and standing or sitting and walking, rather than standing and walking the entire eight-hour day.

14

Additionally, any error in the amount of time Plaintiff could spend standing or walking was harmless because the vocational expert determined there were sedentary jobs Plaintiff could perform. [R. at 78.] Plaintiff contends these jobs were not appropriate because Plaintiff was limited in her ability to sit for long periods, and the ALJ failed to "account for the claimant's need to alternate positions in her hypothetical question to the vocational expert." [Dkt. 17 at 20.] The ALJ, however, stated in her hypothetical that the Plaintiff could only "sit for one hour at a time." [R. at 76.] Thus, the ALJ did account for Plaintiff's limitations, and the expert's responses constitute substantial evidence supporting the ALJ's conclusions.

### 4. Failure to Consider Hearing Difficulties

Plaintiff finally contends the physical RFC determination was faulty because it did not account for Plaintiff's hearing loss. [Dkt. 17 at 21.] Plaintiff acknowledges the ALJ considered Parker's hearing limitations, but argues the ALJ made an "arbitrary" decision and did not explain how limiting the Plaintiff to "quiet" or "moderate" work environments "reflects the actual limitations due to her hearing loss." [*Id.*] Defendant responds that limiting the noise levels was a logical accommodation. [Dkt. 18 at 17.]

As noted above, the ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176. The ALJ in this case acknowledged Parker suffered from "decreased hearing in her bilateral ears." [R. at 26.] To accommodate this limitation, the ALJ restricted Parker to work in "environments where the noise level is 'quiet' or 'moderate.'" [R. at 26.] This was entirely logical: Placing a claimant with hearing loss in quiet or moderate environments prevents further damage to the claimant's hearing and allows her to understand conversations by limiting interference from background noise. *See Powell v. Colvin*, No. 1:13-CV-00274-TWP, 2014 WL 69775, at *1, 3 (S.D. Ind. Jan. 7, 2014); *Lewis v. Astrue*, No. 11 C

15

3466, 2012 WL 1831277, at *5 (N.D. Ill. May 18, 2012). The ALJ's response to Parker's limitation was therefore logical, and Plaintiff's argument lacks merit.

B. **Mental RFC determination**

1. **Failure to Consider Social Restrictions**

Plaintiff argues the ALJ assessed an inaccurate mental RFC because she did not find Plaintiff suffered from any social restrictions and did not present Plaintiff's alleged social limitations to the vocational expert. [Dkt. 17 at 22.] Plaintiff relies on Dr. Randal Horton's evaluation stating Plaintiff could relate to co-workers and supervisors on "at least a superficial basis," [R. at 438], and contends this finding indicates Plaintiff would not be able to tolerate supervision of her work. [Dkt. 17 at 22-23.] The Commissioner responds that the ALJ appropriately considered the evidence of Plaintiff's social limitations and was justified in not presenting social limitations to the vocational expert. [Dkt. 18 at 18.]

An ALJ "is required only to incorporate into his hypotheticals those impairments he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). As long as the question has the support of "medical evidence in the record," it is proper. *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987).

The ALJ in this case adequately considered the available medical evidence of social limitations before submitting her hypothetical questions. She noted that during Plaintiff's 2010 psychological consultative examination, Plaintiff had "average" ability to relate to the examiner and "good" social reciprocity. [R. at 16.] She also observed that, although Plaintiff was initially uncomfortable during the exam, she eventually established a rapport with the examiner, attempted each task with "full effort" and "made appropriate eye contact." [*Id.*] The ALJ therefore concluded Plaintiff had only "mild" limitations, which would not "significantly affect

16

her social functioning." [*Id.*] Based on this consideration of the evidence, the ALJ was justified in not submitting social limitations to the vocational expert.

Plaintiff's reliance on the finding of "superficial" interactions with co-workers is misplaced. As Defendant notes, the psychologist's finding was that Plaintiff would be able to develop "at least" superficial relationships. [Dkt. 18 at 18.] This finding therefore established a floor, not a ceiling, on Plaintiff's social functioning, and did not limit the Plaintiff's RFC. Further, Plaintiff makes an unfounded leap in arguing that because some interactions would be superficial, the Plaintiff would not be able to tolerate supervision. [Dkt. 17 at 23.] Nothing in Dr. Horton's examination indicated Plaintiff had such severe intolerance to supervision [R. 436-54], and in fact, Dr. Horton found Plaintiff was "not significantly limited" in the ability to "respond appropriately to criticism from supervisors." [R. at 437.] The ALJ was therefore justified in not including this limitation in her hypotheticals.

**2.      Failure to Credit Dr. Howitz's Opinions**

Plaintiff finally argues the ALJ erred in failing to give greater weight to the opinion of Dr. Javan Horwitz. [Dkt. 17 at 23.] Dr. Horwitz found Plaintiff's mood instabilities "may slow her performance down at times" and, in conjunction with her physical impairments, "may . . . significantly compromise[]" her occupational performance. [R. at 416, 417.] The ALJ, however, concluded Plaintiff could "sustain the attention and concentration necessary to carry out work-like tasks with reasonable pace and persistence." [R. at 26.] Plaintiff therefore contends it was error for the ALJ to impose no limitations regarding the ability to perform work "requiring a substantial pace or maintain an average work pace on a regular basis." [Dkt. 17 at 24.] Plaintiff also contends the ALJ failed to comply with SSR 96-8p by not explaining why she rejected Dr. Horwitz's testimony. [*Id.*] The Commissioner responds that the ALJ appropriately considered

17

Dr. Horwitz's opinion and offered an explanation for why she gave it little weight. [Dkt. 18 at 20-21.]

In constructing the RFC, the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). He must engage in more than a "cursory" analysis, and may not "dismiss a line of evidence contrary" to his ruling. *Villano v. Astrue*, 556 F.3d 558 (7th Cir. 2009). The ALJ in this case complied with these requirements.

First, when explaining her RFC determination, the ALJ extensively discussed Dr. Horwitz's findings. [R. at 22-23.] She noted that Dr. Horwitz found only "mild" distractibility, and that Dr. Horwitz concluded Plaintiff "could perform simple, repetitive tasks without much difficulty." [R. at 23.] She also specifically noted that although Dr. Horwitz believed Plaintiff's work pace "might" be slow "at times," Plaintiff's overall pace "would be average." [*Id.*] Finally, she noted that Dr. Horwitz believed Plaintiff did not require "any special accommodations or supervision." [*Id.*] The ALJ therefore considered the contrary evidence—that Parker's pace "might" be slow "at times"—but ultimately determined to give more weight to Dr. Horwitz's conclusion that Parker's pace would be average. Thus, rather than "dismiss" the contrary evidence, the ALJ merely weighed it against Dr. Horwitz's other findings.

Next, Plaintiff correctly notes that if an RFC assessment "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." [Dkt. 17 at 24 (quoting SSR 96-8p).] This requirement, however, is inapplicable to this case. In light of Dr. Horwitz's conclusion that Plaintiff's work pace would be average, the ALJ's determination that Parker could sustain the concentration to work at a "reasonable pace" [R. at 26] does not conflict with Dr. Horwitz's opinion. The ALJ, in short, had no conflict to explain.

18

Finally, even if there were a conflict, the ALJ adequately explained why she found Dr. Horwitz's opinion less credible than other medical evidence. Dr. Horwitz noted that Plaintiff's occupational performance "may be significantly compromised" due the combination of Plaintiff's psychological history and "physical limitations." [R. at 416.] Dr. Horwitz relied on Plaintiff's own statements to assess these physical limitations. [R. at 413, 416.] The ALJ, however, found Plaintiff's own statements were not credible. [R. at 24 (describing inconsistencies in Plaintiff's statements in the "record as a whole").] By explaining why the Plaintiff's statements were not credible, the ALJ thus also addressed the weight given to Dr. Horwitz's opinion. *See Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) ("[W]here a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it.").

In contrast, the ALJ gave greater weight to Dr. Randal Horton's determination that Plaintiff could "attend to tasks long enough to complete them, as well as manage the stresses involved in simple work." [R. at 24.] Whereas Dr. Horwitz's opinion was based partly on Plaintiff's own unreliable statements, the ALJ found Horton's opinion was "consistent with the medical evidence of record." [*Id.*] Thus, to the extent there was any conflict between the ALJ's RFC determination and Dr. Horwitz's opinion, the ALJ adequately explained why she departed from Dr. Horwitz's opinion, and the resulting RFC was not flawed.

## C. The ALJ's Hypotheticals and Conclusions

If an ALJ relies on testimony from a vocational expert, the "hypothetical questions he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto*, 374 F.3d at 474. As described above, the ALJ adequately assessed the medical evidence and determined that Plaintiff's proposed physical and mental limitations were not warranted. The vocational expert's responses to the ALJ's hypotheticals therefore constitute

substantial evidence supporting the ALJ's opinion. *See Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993).

## Conclusion

For the foregoing reasons, the Court finds substantial evidence supports the ALJ's determination that Parker is not disabled. The Magistrate Judge therefore recommends that the Commissioner's decision be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 09/22/2014

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

All ECF-registered counsel of record via email