UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JODI D. PARKER,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN COLVIN,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:14-cv-00160-SEB-MJD |

**ORDER OVERRULING PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This is an action for judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") finding Plaintiff Jodi D. Parker ("Ms. Parker") not entitled to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 416(i), 423(d), & 1382c(a)(3).

**Procedural History**

Ms. Parker filed an application for DIB and SSI in September 2010 in which she alleged a disability onset date of July 5, 2009. This application was denied both initially on January 31, 2011, and upon reconsideration on April 21, 2011. Subsequently, an Administrative Law Judge ("ALJ") found that Ms. Parker failed to qualify as disabled because she was capable, even with her impairment, of performing other available work in the national and local economy. R. at 26–29. After the Appeals Council denied Ms. Parker's request for review on December 4, 2013, the Commissioner's decision became final, and Ms. Parker timely exercised her right to judicial review under 42 U.S.C. § 405(g). This case was referred for consideration to Magistrate Judge Dinsmore, who on September 22, 2014 issued a Report and Recommendation ("R & R") that the

Commissioner's decision be upheld because it was supported by substantial evidence and was otherwise in accordance with law. This cause is now before the Court on Plaintiff's Objections to Magistrate Judge's R & R.

**Factual Background**

Jodi Parker was forty-six years old when she filed her application for DIB and SSI on the basis of hip and knee injuries, bipolar disorder, and hearing loss. R. at 90.[1] She had previously been employed as a cashier for companies such as Menard's and Wal-Mart. R. at 45–52. Ms. Parker received medical treatment from her primary care physician, Dr. Jose Valena, between 2008 and 2012. Dr. Valena diagnosed Ms. Parker with hypertension, diabetes mellitus, chronic back pain; osteoarthritis of the spine, knees, and hips, anxiety disorder, and bipolar disorder. R. at 19, 267, 273, 286, 480, 588.

In 2009, Ms. Parker visited the emergency room several times to obtain medical care. In January, she received treatment for left knee pain, but X-rays came back negative. R. at 372–74. In April, Ms. Parker returned to the emergency room for back and hip pain, but X-rays again came back negative. R. at 364–67. Finally, in May, Ms. Parker returned to the emergency room for chest and left arm pain, R. at 345, but tests indicated "no active disease" or anomalies. R. at 356, 358. Ms. Parker was released from the emergency room in stable condition. R. at 360.

In 2010, Ms. Parker underwent a series of medical consultations as required by the benefits application process. In November 2010, Dr. Nicole Caldwell performed a physical consultative exam, during which Ms. Parker reported that she had been involved in a car accident several years prior and, as a result, suffered from back, hip, and knee pain. R. at 420. Ms. Parker also reported that she had been diagnosed as bipolar, but stated that her medication properly

[1] All citations to "R," refer to the administrative record found at Docket no. 14.

managed that condition. *Id*. Furthermore, although Ms. Parker reported having a history of hearing loss, Dr. Caldwell observed that Ms. Parker could understand speech at a normal volume and without looking at the speaker's face. R. at 420–22. Dr. Caldwell noted that Ms. Parker's lungs were clear, her extremities were normal, her neurological function was intact, and her posture and gait were normal. R. at 421. Dr. Caldwell diagnosed Ms. Parker with chronic hip pain, chronic back pain, and osteoarthritis, and he recommended additional imaging tests to assess those conditions. *Id*. Those tests yielded mixed results. X-rays of Ms. Parker's hip were negative, R. at 424, but X-rays of her knees showed a loose body and osteoarthritis, R. at 425–26. X-rays of Ms. Parker's back showed mild degenerative changes, R. at 427, and subsequent X-rays of her knees showed a potential meniscus tear. R. at 637–40.

In addition, in November 2010, Dr. Javan Horwitz conducted a psychological consultative exam. R. at 412. Dr. Horwitz found that Ms. Parker had good social skills, attempted each task with full effort, and related to the examiner with average ability. R. at 414–16. Dr. Horwitz noted Ms. Parker's history of bipolar disorder and anxiety, R. at 413, and stated that her "mood instability may slow her [work] performance down at times." R. at 416. Dr. Horwitz nonetheless determined Ms. Parker could perform simple tasks "without much difficulty." *Id*.

Disability Determination Bureau doctors also conducted physical and mental Residual Functional Capacity ("RFC") evaluations in January 2011. R. at 428, 436. Dr. A. Dobson completed a physical RFC analysis, R. at 435, and he concluded that Ms. Parker could stand and/or walk for about six hours per day, sit for about six hours per day, and otherwise engage in a range of light work. R. at 428–35. Dr. Randal Horton completed the mental RFC analysis. R. at 440. Dr. Horton concluded that Ms. Parker could relate to coworkers "on at least a superficial

basis" and focus on tasks for "sufficient periods of time" to complete them. R. at 438. Dr. Horton's Psychiatric Review submission indicated that Ms. Parker's impairments did not meet or medically equal a listing in 20 C.F.R. Part 404's Listing of Impairments. R. at 440–52.

In 2012, Ms. Parker was hospitalized twice. In March of that year, she visited the hospital due to complaints of muscle pain and weakness. R. at 549. Tests revealed that Ms. Parker had low potassium levels and, as a result, she was given a potassium supplement. R. at 557. During this visit, Ms. Parker was also diagnosed with chronic obstructive pulmonary disease ("COPD"). R. at 557. Ms. Parker's oxygen saturation was low (85%), R. at 548, and the hospital staff heard "crackles" in her lungs. R. at 581. The oxygen saturation level increased to 96% after Ms. Parker was placed on supplemental oxygen. R. at 548. During the same hospital visit, Ms. Parker underwent two CT scans—one of her abdomen and the other of her chest. R. at 566–69. The CT scan of her abdomen revealed "small bilateral pleural effusions with bibasilar dependent atelectasis" in her lungs as well as "[l]inear bands of atelectasis and/or scarring [ ] within the lingual and right middle [lung] lobe." R. at 566. With respect to the CT scan of Ms. Parker's chest, the radiologist observed "[i]nterlobular septal thickening throughout the upper and lower lungs, with minimal subpleural groundglass airspace disease, and mild bilbasilar airspace consolidation with adjacent trace bilateral pleural effusions. Taken together, these findings are most suggestive of fluid overload with mild interstitial edema and effusions, with adjacent passive atelectasis." R. at 568. At the conclusion of her hospital visit, Ms. Parker was instructed to use "[o]xygen per nasal cannula with activity," R. at 558, but Ms. Parker denied having shortness of breath or respiratory distress at that moment. R. at 548.

Following that first hospital visit, Ms. Parker obtained a home oxygen unit. R. at 563. The technician delivering the unit completed a home oxygen evaluation. *Id*. After conducting the

evaluation, the technician observed that Ms. Parker's SpO2 level fluctuated depending on her activity. *See* R. at 564. While sitting, Ms. Parker's SpO2 level was in the "low 90s"; while walking, it increased to the "high 90s"; after walking and sitting down, it decreased to 86%; and after being placed on supplemental oxygen, it increased to 93%. *Id*.

In April 2012, Ms. Parker visited the hospital a second time, this time complaining of nausea and back pain. R. at 596. The hospital determined that her potassium levels were abnormally high, and that she was suffering renal failure. R. at 597. This time Ms. Parker did not complain of respiratory symptoms. R. at 604. Her lungs were "clear," R. at 606, and her oxygen saturation level was much higher than it was in March. R. at 597.

At the June 2012 hearing before the ALJ, Ms. Parker testified about her condition. Ms. Parker said she could stand for 45 minutes at most, could walk perhaps a few blocks, and likely could not sit for periods long enough to work behind a desk. R. at 58–62. The ALJ found this testimony not to be credible, noting that Ms. Parker had previously reported being able to care for her mother and perform routine chores, such that she could likely perform light work. R. at 24. The ALJ also credited Dr. Dobson's and Dr. Horton's reports, both of which concluded Ms. Parker could perform certain unskilled work. R. at 23–24.

At the hearing, Ms. Parker further testified that, because of respiratory difficulties, she had begun using supplemental oxygen when exerting herself. R. at 68–69. Ms. Parker testified that in May 2012 she attempted to push a lawn mower outside for fifteen to twenty minutes, but had had to stop because of shortness of breath. R. at 70. However, the ALJ noted there was little evidence of oxygen or respiratory ailments in the record, and Parker's attorney agreed that he was "surprised" and "curious about the oxygen thing." R. at 38–39. The ALJ held the record

open to receive additional evidence of Ms. Parker's respiratory condition, but Ms. Parker never submitted any new evidence. R. at 11.

Vocational expert Robert Barber also testified at the hearing. The ALJ asked Mr. Barber whether a hypothetical person of Ms. Parker's age, education, and work experience could perform Ms. Parker's past work as a cashier. R. at 77. The ALJ included several limitations. For example, this hypothetical person could sit for one hour at a time for a total of six hours, stand for one hour at a time for a total of four hours, or walk for four hours at a time for a total of eight hours. R. at 76. Also, the hypothetical person could only work in environments with "quiet" or "moderate" noise levels. *Id*. The ALJ did not, however, include any respiratory limitations, social limitations, or limitations relating to renal failure. R. at 76–77.

Mr. Barber concluded that such a hypothetical person would be able to perform the work that Ms. Parker had previously performed as a cashier at Wal-Mart. R. at 77. Mr. Barber also testified that such a person could work as an apparel sorter, usher, or information clerk, and she stated that several thousand of these positions existed in Indiana and the national economy. R. at 77–78. Additionally, Mr. Barber testified that such a person could perform sedentary work as a general office clerk, ticket checker, or telephone quote clerk. R. at 78. Again, Mr. Barber stated that several thousand of these sedentary jobs existed in the state and the nation. R. at 28, 78.

## Standard of Review

We review the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). In our review of the

ALJ's decision, we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] own judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. However, the ALJ's decision must be based upon consideration of "all the relevant evidence," without ignoring probative factors. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In other words, the ALJ must "build an accurate and logical bridge" from the evidence in the record to her final conclusion. *Dixon*, 270 F.3d at 1176. We confine the scope of our review to the rationale offered by the ALJ. *See SEC v. Chenery Corp*., 318 U.S. 80, 93–95 (1943); *Tumminaro v. Astrue*, 671 F.3d 629, 632 (7th Cir. 2011).

When a party raises specific objections to elements of a magistrate judge's report and recommendation, the district court reviews those elements *de novo*, determining for itself whether the Commissioner's decision as to those issues is supported by substantial evidence or was the result of an error of law. Fed. R. Civ. P. 72(b). The district court "makes the ultimate decision to adopt, reject, or modify" the report and recommendation, and it need not accept any portion as binding; the court may, however, defer to those conclusions of the report and recommendation to which timely objections have not been raised by a party. *See Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 759–61 (7th Cir. 2009).

## Discussion

Ms. Parker objects to Magistrate Judge's conclusions with respect to the ALJ's decision in four respects: (1) the ALJ's consideration of the evidence regarding COPD and hearing loss; (2) the ALJ's credibility determinations regarding Ms. Parker's standing, sitting, and walking limitations; (3) the ALJ's consideration of the evidence regarding mental capacity; and (4) the Magistrate's compliance with the *Chenery* doctrine.

### I. The ALJ's Consideration of Evidence regarding COPD and Hearing Loss

In formulating Ms. Parker's residual functional capacity, the ALJ set forth a detailed discussion of Ms. Parker's abilities pursuant to 20 C.F.R. § 404.1545 and Social Security Ruling 96-8p. R. at 18–26.

According to Social Security Ruling 96-8p, "[t]he RFC assessment must be based on all of the relevant evidence in the case record." S.S.R. 96-8p. Moreover, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. Although it would be unnecessary for an ALJ to "mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). The ALJ "may not ignore entire lines of contrary evidence" in arriving at her conclusion. *Id.* (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

**a. The ALJ's consideration of Ms. Parker's COPD**

According to Ms. Parker, the ALJ failed to account for her recent diagnosis of chronic obstructive pulmonary disease ("COPD") before dismissing her allegations that she required oxygen supplementation during physical exertion. Obj. 2–5. In doing so, Ms. Parker contends, the ALJ ran afoul of Social Security Ruling 96-8p. *Id*. Ms. Parker cites a portion of the transcript from her administrative hearing in which the ALJ states that she had reviewed the file and did not see any reference to COPD. Obj. at 2 (citing R. at 39). This statement was in response to Ms. Parker's counsel's statement at the hearing that he was "curious about the oxygen thing . . . ." R. at 38. Ms. Parker argues that this failure to consider evidence violates the Seventh Circuit's precedent as set forth in *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). In *Arnett*, the court held that the ALJ failed to adequately incorporate the claimant's dementia and degenerative disc

conditions into the RFC because the ALJ "never mentioned" them. *Id*. Indeed, the Seventh Circuit "had no idea what the ALJ thought about this evidence." *Id*.

However, far from "ignor[ing] entire lines of contrary evidence" regarding COPD or "never mention[ing]" it, the ALJ confronted that contrary evidence from the outset. As the Commissioner indicates, the ALJ noted at the hearing that the record lacked evidence of COPD. At Ms. Parker's counsel's request at the hearing, the ALJ left the record open for 15 days, so as to give Ms. Parker an opportunity to submit evidence of treatment for COPD. R. 38–41. That evidence never came. R. at 11.[2]

Absent supplementation, the record simply does not contain ample evidence of treatment for COPD.  Instead, it contains only sporadic references to Ms. Parker's respiratory wellbeing in general. R. at 545–58, 563–64, 585–93, 597–98, 604–35, 641–54. And the record contains even fewer references to objective medical evidence of COPD in particular. R. at 568, 581. The fact that the ALJ did not cite "every snippet of evidence" relating to COPD in the record does not mean that the ALJ did not adequately consider COPD. "An ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011)).

Here, the ALJ adequately considered the evidence that Ms. Parker did submit. The ALJ noted that during the physical consultative examination in November 2010, performed by Dr. Nicole Caldwell, Ms. Parker's "lungs were clear to auscultation, with no evidence of crackles, rhonchi, rales, or wheezes." R. at 20. Furthermore, the ALJ specifically discussed two hospital

[2] Indeed, Ms. Parker's Objection to Magistrate Judge's Report and Recommendation fails to mention that the record was left open for admission of additional evidence and, likewise, fails to mention that no additional evidence was provided. *See* Obj. 1–11.

stays in which Ms. Parker's oxygen levels and treatment were mentioned. R. at 21–22. Ms. Parker reiterates in her objection that in March 2012, she visited the hospital due to low potassium levels and an examiner found that her oxygen saturation levels were low as well. The ALJ, however, specifically discussed this hospital stay. R. at 21–22. Ms. Parker also states that in April 2012, she visited the hospital due to high potassium levels. The ALJ specifically discussed this hospital stay as well. R. at 21–22. Finally, and most importantly, the ALJ clearly stated at the hearing that the amount of COPD evidence in the record was insufficient and that supplementary evidence would be required to tip the scales in Ms. Parker's favor. Again, that supplementary evidence never came. R. at 11.

We therefore conclude that the ALJ adequately supported her RFC finding with substantial medical and non-medical evidence, consistent with the requirements of Social Security Ruling 96-8p.

**b. Ms. Parker's hearing loss**

In a footnote, Ms. Parker objects to the ALJ's decision on the grounds that the ALJ did not properly consider Ms. Parker's hearing loss before reaching a conclusion. Obj. at 5 n.4. Ms. Parker asserts that she has difficulty understanding conversations "even in quiet situations." *Id*. She notes that her hearing loss was "objectively documented" and that she dealt with her impairment "by having people turn to her so she could read their lips." *Id*. (citing R. at 22, 41–42, 64). Essentially, Ms. Parker argues that the ALJ's RFC findings were arbitrary and "entirely unexplained." *Id*.

However, although the ALJ apparently did not find Ms. Parker's hearing loss to restrict her abilities to the extent that Ms. Parker had hoped, the ALJ did base her RFC conclusion on a thorough consideration of all hearing loss evidence. *See* R. at 26. The ALJ noted that Ms. Parker

had "decreased hearing" and had been prescribed hearing aids in December 2009. R. at 26. But the ALJ chose to accord greater weight to Ms. Parker's November 2010 consultative exam with Dr. Caldwell. R. at 419–23. The ALJ echoed Dr. Caldwell's finding that Ms. Parker was not wearing hearing aids during that exam and, nevertheless, was able to understand Dr. Caldwell without facing her and without the doctor having to increase the volume of her speech. R. at 419. The ALJ credited Dr. Caldwell, who opined that Ms. Parker did not seem to be limited in any way due to her hearing loss. R. at 423. Therefore, the ALJ acknowledged that Ms. Parker had bilateral hearing deficits, but found that those deficits "do not prevent her from working." R. at 26.

Nevertheless, the ALJ did restrict Ms. Parker to working in environments where the noise level is quiet or moderate. R. at 18, 26, 76–82. To the extent that the ALJ's RFC findings implicated Ms. Parker's ability to hear, the ALJ supported those findings with substantial evidence.

## II. The ALJ's credibility determinations regarding Ms. Parker's standing, sitting, and walking limitations

Ms. Parker argues that the ALJ made an erroneous credibility determination regarding her ability to stand, sit, and walk, arguing that the ALJ's finding that she could stand and walk for an entire eight-hour workday without ever sitting down was unreasonable. Obj. at 7–8 n.5. In support of her objection, Ms. Parker points to the fact that Dr. Dobson concluded that Ms. Parker could stand or sit for a total of only six hours in an eight-hour day. *Id*.

A reviewing court must "give an ALJ's credibility determination special, but not unlimited, deference." *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012). Nevertheless, an ALJ "must support credibility findings with evidence in the record." *Id*. The regulations state that the Social Security Administration "will consider [the claimant's] statements about the intensity,

persistence, and limiting effects of [her] symptoms, and [the SSA] will evaluate [the claimant's] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [she is] disabled." 20 C.F.R. § 404.1529(c)(4).

Here, contrary to Ms. Parker's assertion, the ALJ did not find that Ms. Parker could stand and walk for an entire eight-hour workday without ever sitting down. At the hearing, in response to Ms. Parker's counsel's questioning, the ALJ clearly stated that her RFC determination limited Ms. Parker to a total of six hours sitting, for one hour at a time; a total of four hours standing, for one hour at a time; and a total of four hours walking, for one hour at a time. R. at 79. Furthermore, Ms. Parker's counsel asked the ALJ if she was limiting Ms. Parker to a total of eight hours walking and standing. R. at 79. The ALJ responded, "One hour at a time . . . . Or she could be standing for four hours of eight and the rest sitting . . . in any combination." R. at 79–80. Ms. Parker's counsel did not ask any further questions. The ALJ's responses in that exchange directly refute Ms. Parker's contention that "it is simply inaccurate to suggest the ALJ's hypothetical thus envisioned a combination of sitting and standing and walking." Obj. at 8 n.5. Ultimately, the ALJ "[found] the claimant credible to the extent that she has several chronic physical health issues . . . [but found] no reason, however, that she cannot walk and stand for four hours a day." R. at 26.

The Commissioner is also correct to point out that the ALJ asked the vocational expert about the existence of sedentary jobs. Def.'s Br. at 5; R. at 78. The vocational expert identified some sedentary jobs that someone with Ms. Parker's RFC could perform. R. at 78–79.

Therefore, contrary to Ms. Parker's assertions, the ALJ did in fact "build an accurate and logical bridge" from the relevant evidence to the RFC finding. *See Dixon*, 270 F.3d at 1176.

## III. The ALJ's consideration of Ms. Parker's mental capacity

Third, Ms. Parker objects to the ALJ's decision on the grounds that the ALJ erroneously failed to credit the opinion of consulting psychologist Dr. Horwitz. Obj. at 8–9. Ms. Parker correctly notes that an ALJ must "consider the medical opinions in . . . [the] case record together with the rest of the relevant evidence . . . receive[d]." Obj. at 9 (citing 20 C.F.R. § 404.1527(b)). Ms. Parker then asserts broadly that the ALJ "offered no explanation whatsoever for discounting [Dr. Horwitz's] opinion that her pace would likely slow down at times." Obj. at 8–9.

That sweeping claim, however, is rooted in a mischaracterization of Dr. Horwitz's opinion. Dr. Horwitz did not state that Ms. Parker's pace would "likely" slow down at times. *See* R. at 23. He said that it "may" slow down at times. R. at 416. This qualification was not lost on the ALJ as it was apparently lost on Ms. Parker's counsel. *See* R. at 23. Furthermore, as the Commissioner noted, the ALJ specifically discussed all but one of the findings that Ms. Parker cites in her brief. R. at 22–23. For example, the ALJ considered Dr. Horwitz's opinion that although Ms. Parker's mood instability "may slow down her work performance at times," Ms. Parker's psychological functioning suggested that "her work pace is likely to be *average*." R. at 23, 416–17 (emphasis added). Additionally, the ALJ considered Dr. Horwitz's impression that Ms. Parker's skills relating to sustained mental effort and working memory were only *mildly* compromised and that Ms. Parker experienced only *mild* distractibility. R. at 23. Ultimately, Dr. Horwitz himself concluded that Ms. Parker could perform simple, repetitive tasks without much difficulty. R. 416. The ALJ simply adopted that conclusion in her decision. R. at 23.

It is true that the ALJ did not specifically discuss Dr. Horwitz's comment that Ms. Parker's combined physical and mental conditions may significantly compromise her occupational functioning. R. at 416. However, although Dr. Horwitz credited Ms. Parker's subjective statements in assessing her physical limitations, R. at 414–17, the ALJ did not. The

ALJ explained in detail why she did not fully credit Ms. Parker's allegations regarding the magnitude, persistence, and implications of her physical impairments. R. at 18–26. Also, the ALJ specifically noted Dr. Horwitz's assignment of a Global Assessment of Functioning (GAF) score of 59, which indicated no more than moderate occupational difficulties. R. at 23.

Ultimately, the ALJ acknowledged that Ms. Parker "has decreased concentration, secondary to her anxiety and mood swings," but concluded that "she nonetheless retains the ability to understand, remember, and follow simple instructions." R. at 26. The ALJ adopted Dr. Horwitz's conclusion that Ms. Parker is able to sustain the attention and concentration necessary to carry out simple, repetitive tasks with reasonable pace and persistence. *Id*. This conclusion was based on a sufficient consideration of all evidence regarding Ms. Parker's mental capacity.

## IV. The Magistrate's compliance with the *Chenery* Doctrine

According to the United States Supreme Court in *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80 (1943), "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." 318 U.S. at 87. Furthermore, as the Seventh Circuit indicated in *Arnett*, "the agency's attorneys may not advance an explanation the agency never made itself and may not attempt to support the decision with evidence the agency did not consider." 676 F.3d at 593.

Ms. Parker asserts that the Magistrate violated the *Chenery* doctrine by justifying the ALJ's decision regarding COPD and hearing loss using evidence that the ALJ did not consider. Obj. at 5–7. It is not completely clear what part of the Magistrate's decision Ms. Parker alleges violated *Chenery*. *See id*. With respect to COPD, Ms. Parker comes closest to explaining how such a violation occurred by simply providing a citation to pages 11 and 12 of the Magistrate's R & R. Obj. at 5.

On those pages, however, the Magistrate does not "advance an explanation the agency never made itself," but rather points out that the COPD evidence was not as significant as Ms. Parker represented in her opening brief. *See* R & R at 11–12. Ms. Parker asserted in her opening brief that the record contained "ample evidence of COPD." Pl.'s Opening Br. at 18. The Magistrate countered that exaggeration, for example, by repeating Dr. Caldwell's finding in the 2012 hospital visit that Ms. Parker's lungs were "clear" and that she did not complain of respiratory symptoms. R & R at 11. Ms. Parker has failed to demonstrate how it is a violation of *Chenery* for a Magistrate to point out that a plaintiff has overstated the evidence. *See* Obj. 5–7. In any case, the district court reviews *de novo* the Magistrate's decision that the ALJ properly considered the evidence of COPD. *See* Fed. R. Civ. P. 72(b). Again, the ALJ stated at the hearing that the evidence submitted did not reflect a respiratory condition. R. at 38. Ms. Parker failed to supplement that evidence. R. at 11. Faced with that omission, the ALJ supported her RFC finding with substantial medical and non-medical evidence consistent with the requirements of Social Security Ruling 96-8p. R. 18–26.

Similarly, with respect to hearing loss, Ms. Parker asserts—without explaining—that the Magistrate violated the *Chenery* doctrine. Obj. at 5 n.4. This time, however, Ms. Parker fails to quote or provide a citation to the part or parts of the Magistrate's Recommendation that allegedly run afoul of the doctrine. *See* Obj. at 5 n.4. In the ALJ's RFC analysis, the ALJ discussed Ms. Parker's hearing loss in detail. R. at 22, 24, 26. The ALJ noted that Ms. Parker suffered from "decreased hearing in her bilateral ears" but concluded that this impairment "[did] not prevent her from working." R. at 26. The ALJ accommodated this condition by restricting Ms. Parker to work in "environments where the noise level is quiet or moderate." *Id*. (internal quotations omitted). It is true that the ALJ did not take pains to spell out the precise reason why someone

with impaired hearing might be better off in a work setting that is not pervaded by loud ambient noise. It is also true that the Magistrate went ahead and spelled out the obvious implication—that loud ambient noise might make it more difficult for a hearing-impaired person to listen and communicate. R & R at 15. Nevertheless, the ALJ's in-depth analysis speaks for itself. The ALJ discussed Ms. Parker's hearing loss in depth, acknowledged that she was hearing-impaired, and provided a logical accommodation in the RFC analysis. In short, the Magistrate properly summarized the ALJ's reasoning, and we agree with his conclusion that the ALJ's findings were well-supported.

**Conclusion**

We find that none of Ms. Parker's objections to the Magistrate Judge's Report and Recommendation has merit. The ALJ's conclusions with respect to COPD; hearing loss; standing, walking, and sitting limitations; and mental capacity were supported by substantial evidence and free from legal error. Accordingly, the Plaintiff's objections to the Magistrate Judge's well-reasoned Report and Recommendation are OVERRULED and we ADOPT the recommendations set forth therein.

IT IS SO ORDERED.

03/25/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov